JOHN W. HUBER, United States Attorney (#7226)
THADDEUS MAY, Assistant United States Attorney (#11317)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801)524-5682
Tad.may@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE WHITE IPHONE SERIAL NUMBER CCONT26JF4Y6 (EXHIBIT N-10), BLACK KYOCERA FLIP PHONE IMEI 015247001704923 (EXHIBIT N-11), BLACK SAMSUNG GALAXY S10+ IMEI 354642101110188 (EXHIBIT N-12), BLACK SAMSUNG S8+ IMEI 357725085849579 (EXHIBIT N-13) – IPHONE WITH SILVER CASE (EXHIBIT N-14); CELLULAR DEVICES CURRENTLY LOCATED AT 348 EAST SOUTH TEMPLE, SALT LAKE CITY, UTAH. | **AFFIDAVIT**<br><br>Case No. 2:19mj280 BCW |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, **Johnny Ngo**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of electronic devices that are currently in law enforcement possession, and the extraction from these electronic devices of electronically stored information described in Attachment B.

2. I am a Task Force Officer (TFO) with the Drug Enforcement Administration Metro Narcotics Task Force (DEA MNTF), United States Department of Justice. The DEA Salt Lake City District Office is a multi-agency task force responsible for investigating major drug trafficking organizations. I have been employed by the Unified Police Department (UPD) for the past seven years. I worked as a uniformed patrol officer with UPD for approximately five years before transferring into the narcotics unit. I have attended multiple trainings related to narcotics identification and the investigations of narcotic-related offenses. I was previously assigned to the Wasatch Range Task Force, which was an FBI Narcotics Task force, the High Risk Victims Units within UPD, which investigates vice-related crimes including but not limited to prostitution, narcotics and human trafficking. As a Task Force Officer (TFO) with the Drug Enforcement Administration I have conducted numerous undercover operations during these investigations resulting in the arrest of several involved individuals. I have participated in several investigations involving drug trafficking activities, money laundering and conspiracy to do the same and have written and executed numerous search warrants. These investigations have resulted in arrests and convictions of individuals who have smuggled, received and distributed controlled substances, as well as the seizure of controlled substances and proceeds of the sale of those controlled substances.

3. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

4. I have participated in the investigation of the offenses set forth below. As a result of my personal participation in this investigation, and analyses of reports submitted by other officers, I am familiar with all core aspects of this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5. This affidavit is submitted for the limited purpose of seeking authorization for a search warrant for a cellular telephones, described as WHITE IPHONE SERIAL NUMBER CCONT26JF4Y6 (EXHIBIT N-10), BLACK KYOCERA FLIP PHONE IMEI 015247001704923 (EXHIBIT N-11), BLACK SAMSUNG GALAXY S10+ IMEI 354642101110188 (EXHIBIT N-12), BLACK SAMSUNG S8+ IMEI 357725085849579 (EXHIBIT N-13) and IPHONE WITH SILVER CASE (EXHIBIT N-14). These four devices were seized from George HYPPOLITE and Avalon WOLLENBERGER on April 4, 2019 from 4534 South Lake Springs Lane, following their arrests. The devices are currently located at 348 East South Temple, Salt Lake City, Utah, as secured evidence. The devices are described in more detail in Attachment A.

6. This affidavit does not purport to set forth all of my knowledge of or investigation into this matter.

7. As set forth below, I submit that there is probable cause to believe that within the data inside the Device there exists evidence of violations of 21 U.S.C § 841(a)(1), Distribution and Possession with Intent to Distribute a Controlled Substance, 21 U.S.C § 843(b), Unlawful Use of a Communication Facility, and 21 U.S.C § 846, Conspiracy to Distribute a Controlled Substance.

## FACTS TO ESTABLISH PROBABLE CAUSE

8. In July of 2018, members of the DEA Metro Narcotics Task Force conducted an investigation on a known drug distributor in the Salt Lake County area. Information was obtained

3

through a confidential source (CS)[1] individuals later identified as George HYPPOLITE and Avalon WOLLENBERGER were distributing cocaine in the Salt Lake City area.

9. On February 8, 2019, agents conducted a controlled purchase of cocaine utilizing the CS to purchase from HYPPOLITE and WOLLENBERGER. A deal location was established and agents met with the CS in a neutral location. A recorded phone call was placed to HYPPOLITE and WOLLENBERGER's phone number of 385-270-7203 from the CS's telephone. A female answered, confirmed by the CS to be WOLLENBERGER. The CS ordered "two B's" (two eight balls of cocaine which is approximately seven grams). WOLLENBERG agreed and the conversation ended. The CS was searched for drugs, cash and weapons by agents prior to the deal and none of these items were located. The CS was provided with investigative funds for this purchase and an electronic monitoring device. The CS was then followed to the deal location and monitored.

10. A short time later, agents observed a white Dodge Durango bearing Utah license plate F997MY, which matched the vehicle information the CS had previously provided, pull onto the target street occupied by a female (who was later confirmed to be WOLLENBERGER) and arrive at the deal location. Agents observed the CS meeting with WOLLENBERGER and completing the deal for the suspected cocaine. WOLLENBERGER then left the deal location and surveillance was conducted on WOLLENBERGER. Once WOLLENBERGER left the area, other agents met with the CS and recovered the suspected cocaine. The CS was searched once again for drugs, money and weapons and none of these items were located and the CS was released.

---

[1] The CS has a criminal history involving property crimes, drug possession and distribution. The CS has been providing information in consideration of current charges and sentencing. The information provided by the CS has been corroborated by agents and proven credible.

11. Surveillance was able to follow WOLLENBERGER back to a residence located at 4534 South Lake Springs Lane, the TARGET LOCATION, and observed WOLLENBERGER pulling into the garage of this residence and closing the garage door. Agents completed surveillance at this point.

12. Agents transported the suspected cocaine back to the DEA Salt Lake City District Office (SLCDO) where it was tested and presumptively tested positive as cocaine HCL and weighing 7.1 grams. The cocaine was sent to the Western Lab for processing.

13. On March 4, 2019, agents conducted a second controlled purchase of seven grams of cocaine utilizing the CS from HYPPOLITE and WOLLENBERGER. Prior to the operation, the CS had provided information to agents that HYPPOLITE was driving a new rental vehicle and described it as a maroon colored sports utility vehicle. Agents conducted surveillance at the TARGET ADDRESS as well as the deal location. Agents observed HYPPOLITE standing outside the garage at the TARGET ADDRESS smoking a cigarette and then went back inside and shut the garage door.

14. As agents were about to meet with the CS, surveillance observed a maroon Dodge Durango bearing Utah license plate F880MY arrive at the deal location. Agents met with the CS at a neutral location and were advised by the CS that WOLLENBERGER was at the deal location. The CS was searched for drugs, money and weapons and none of these items were located. The CS was provided with investigate funds and an electronic monitoring device and followed back to the deal location.

15. The CS arrived at the deal location and was observed by agents, meeting with WOLLENBERGER who was the driver of the Dodge Durango, and completed the deal for the suspected cocaine. WOLLENBERGER left the deal location and surveillance was conducted.

5

Once WOLLENBERGER left the area, agents met with the CS back at the neutral location where the suspected cocaine was recovered and the CS confirmed that WOLLENBERGER was the person who sold the cocaine to the CS. The CS was searched for drugs, cash and weapons prior to leaving and none of these items were found.

16. Surveillance was able to follow WOLLENBERGER directly back to the TARGET ADDRESS and observed her pull into the garage. Agents completed surveillance at this point.

17. Agents transported the suspected cocaine back to the SLCDO where it was tested positive as cocaine HCL. The cocaine weighed 37.5 grams (Total package weight). The cocaine was then sent to the Western Lab for processing.

18. On March 19, 2019, a third controlled purchase of seven grams of cocaine utilizing the CS from HYPPOLITE and WOLLENBERGER was conducted. Surveillance was conducted at the TARGET ADDRESS and deal location. Agents met with the CS at a neutral location, where the CS was searched for drugs, money and weapons and none of these items were found.

19. Agents had the CS place a phone call to HYPPOLITE at the phone number of 385-270-7203. A male answered (later confirmed to be HYPPOLITE per the CS) and the CS placed the order and the male replied, "I'll be there". The call was completed.

20. Agents out at the TARGET ADDRESSED observed a white Jeep Grand Cherokee bearing Utah license plate F080MZ arrive at the TARGET ADDRESS and pull into the garage. Agents observed HYPPOLITE and WOLLENBERGER exit the garage with a small white dog, sit near the curb, using their cell phones and smoking for a period of time.

21. After a short period, the CS was instructed to send a text message to HYPPOLITE asking "how long". HYPPOLITE replied, "10 minutes". Agents then observed the white Jeep Grand Cherokee leaving the TARGET ADDRESS driven by WOLLENBERGER.

22. The CS was provided with investigate funds and an electronic monitoring device and followed back to the deal location.

23. Surveillance was able to follow WOLLENBERGER from the TARGET ADDRESS directly to the deal location without making any stops in between. Agents observed WOLLENBERGER arrive at the deal location and stop at the location. HYPPOLITE was observed exiting the passenger side of the vehicle and making contact with the CS. After a brief conversation, HYPPOLITE completed the deal with the CS and returned back to the vehicle (WOLLENBERGER remained inside the vehicle). WOLLENBERGER and HYPPOLITE then left the deal location and surveillance followed the vehicle from the area.

24. The CS was followed from the deal location back to the neutral location to meet with agents, where the suspected cocaine was recovered. The CS confirmed with agents HYPPPOLITE was the individual who gave the cocaine to the CS. The CS was once again searched for drugs, money and weapons prior to leaving and none of these items were located. Agents completed surveillance at this point on HYPPOLITE.

25. On March 25, 2019, surveillance was conducted at the TARGET ADDRESS. I was able to observe the white Jeep Grand Cherokee pull into the complex from 1300 East. I observed HYPPOLITE driving the vehicle and WOLLENBERGER in the passenger seat. The Jeep pulled into the garage at the TARGET ADDRESS. Shortly after, I observed HYPPOLITE and WOLLENBERGER exit the garage and sit on the curb for a period of time. Agents transported the suspected cocaine back to the SLCDO where it tested positive for cocaine HCL. The cocaine weighed 38.9 grams (Total package weight). The cocaine was then sent to the Western Lab for processing.

26. On April 4, 2019, a search warrant was executed at the address of 4534 South Lake Springs Lane. HYPPOLITE and WOLLENBERGER were contacted outside near the garage and detained. WOLLENBERGER was holding an I-phone with a silver case (Exhibit N-14), while HYPPOLITE had a Kyocera flip phone (Exhibit N-11) and black Samsung S10+ cell phone (Exhibit N-12) in his pocket. HYPPOLITE was also found with cocaine and cocaine base in his hand when detained. While being searched, HYPPOLITE was able to grab the flip phone while handcuffed and threw it into the street, breaking the cell phone.

27. A black Samsung S8+ (Exhibit N-13) was located in the center console of the Jeep Grand Cherokee along with marijuana and cocaine. A white I-Phone (Exhibit N-10) was located inside the residence on a computer table near additional marijuana and U.S. Currency.

28. During the search warrant, Agents seized 150 grams of cocaine base and 185.5 grams of cocaine.

29. Based upon your affiant's training, experience, and participation in other investigations involving the distribution of controlled substances, your affiant knows the following facts related to drug distributors:

30. Based on my training and experience, consultation with other law enforcement officers experienced in drug trafficking and financial crime investigations, and all the facts and opinions detailed in this affidavit, I know that participants in drug trafficking crimes such as Mr. HYPPOLITE routinely use cellular devices to: (a) maintain contact with co-conspirators and confederates via voice calls, voice mail, text type SMS and MMS messaging, email, application-based messaging and calling services such as WhatsApp, Tango, Dingtone, Facebook, and similar services on their cellular and computer devices; (b) make arrangements to traffic, conceal, or sell illicit narcotics via voice calls, voice mail, text type SMS and MMS message, email, and the

previously indicated application type messaging and calling services on their cellular and computer devices; (c) take and store digital photographs and videos which depict their involvement, or co-conspirator or confederates' involvement, in the distribution of illicit narcotics on their cellular, computer, or camera devices, and additionally these photographs can contain exif data (a type of metadata associated with photographs) which can provide evidentiary location information tagged to the particular photo; (d) draft or keep notes or lists detailing contacts, co-conspirators, confederates, money owed and spent, and evidencing their involvement in the possession and distribution of illicit narcotics on their cellular and computer devices; and (e) additionally, the devices themselves, by use of GPS or computer searches relating to mapping, can contain valuable travel and route data associated with the trafficking and distribution of illicit narcotics. As described in the previous paragraphs, it is common for those involved in the international shipping of illicit narcotics to utilize cellular and/or computer devices to communicate related to those shipments so as to ensure the success of those transactions.

31. Traffickers of controlled substances and those who assist them maintain and retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, stored in vehicles, or electronically on their electronic devices and storage mediums.

32. Drug traffickers and money launderers commonly maintain addresses, vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization. It is common to find drug

9

traffickers/money launderers keeping records of said associates in cellular telephones and/or other electronic devices and storage mediums.

33. Illegal drug traffickers and manufacturers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product. These individuals usually maintain these photographs and recordings in their possession, at their premises, or at some other safe place, such as on their electronic devices and storage mediums.

34. Illegal drug trafficking, manufacturing, and money laundering are continuing activities over months and even years. Illegal drug traffickers will repeatedly obtain (or manufacture) and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase or manufacture stock for sale and, similarly, such drug traffickers will have an "inventory" which will fluctuate in size depending upon various factors to include the demand and supply for the product. Traffickers and manufacturers often keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses illegal controlled substances in order to maintain contact with criminal associates for future drug transactions and so that they have records of prior transactions for which, as an example, they might still be owed money, or might owe someone else money. These records are often created in code and are often stored in electronic devices and storage mediums.

35. Your affiant knows that drug purchasers and dealers depend heavily on cellular telephones for communications with drug trafficking associates. Drug dealers use cellular telephones to inform drug recipients and drug suppliers of their status. Furthermore, drug suppliers and drug recipients use cellular telephones to monitor the progress of drug transporters.

Drug transporters and their associates also often possess more than one cellular telephone so that a different telephone may be used to contact different drug trafficking associates.

36. Your affiant knows that cellular telephones of drug transporters often contain an electronic record of outgoing and incoming calls. The cellular telephones also often contain electronically stored lists of associates, many of whom are co-conspirators. Furthermore, cellular telephones contain an electronic record of its own telephone number. Sometimes access to the electronic contents of a cellular telephone is the only means of determining the telephone number assigned to a particular telephone possessed by a drug dealer or purchaser. All of the foregoing electronic information is useful for identifying and providing evidence against drug distributors and their co-conspirators.

37. I know from experience and training, and as detailed in this affidavit, that those persons involved in the illicit trafficking of narcotics will go to great lengths to conceal, hinder, or thwart law enforcement discovery of their trafficking operation or locations associated with the trafficking of illicit narcotics.

38. The Devices are currently in storage at 348 East South Temple, Salt Lake City, Utah. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## TECHNICAL TERMS

39. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. The "Device" or "Devices" (Wireless telephone): A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to

12

photographs or videos. The "Devices" indicated in this affidavit contain digital cameras.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f. Messaging: The ability to communicate through additional mediums outside of the regular cellular service to include SMS text, MMS, email, application platforms such as but not limited to WhatsApp, Facebook, Dingtone, Google Voice, Viber, etc.

40. Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.phonescoop.com, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, internet computer, and GPS navigation device. Additionally, in my training and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

41. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

42. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

> g. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
>
> h. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
>
> i. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

j. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

44. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

//

//

//

## CONCLUSION

45. I submit that this affidavit supports probable cause for a search warrant authorizing the forensic examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Johnny Ngo
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on April 15 2019:

_____
BROOKE WELLS
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## THE DEVICES TO BE SEARCHED

- **Subject Telephone #1** : WHITE IPHONE SERIAL NUMBER CCONT26JF4Y6 (EXHIBIT N-10),

- **Subject Telephone #2** : BLACK KYOCERA FLIP PHONE IMEI 015247001704923 (EXHIBIT N-11),

- **Subject Telephone #3** : BLACK SAMSUNG GALAXY S10+ IMEI 354642101110188 (EXHIBIT N-12),

- **Subject Telephone #4** : BLACK SAMSUNG S8+ IMEI 357725085849579 (EXHIBIT N-13)

- **Subject Telephone #5** – IPHONE WITH SILVER CASE (EXHIBIT N-14)

- Seized from 4534 South Lake Springs Lane, Millcreek, Utah, on April 4, 2019.

This warrant authorizes the forensic examination of the "Device" for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

# THE INFORMATION TO BE SEIZED

1. All records on the Devices described in Attachment A that relate to violations of Title 21 U.S.C. Sec. 841(a)(1), and Sec. 846, including:

   a. lists of contacts and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information

   d. all bank records, checks, credit card bills, account information, and other financial records, or other records indicating attribution;

   e. all recordings both audio and visual indicating possession, storage, or trafficking (to include exif data associated with visual recordings which can provide evidentiary dates and locations associated with the recordings);

   f. all communications to include but not limited to text or media messages, instant messaging, or messaging applications utilizing the Internet.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet including:

a. records of Internet Protocol addresses used;

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4. Any other fruits or instrumentalities of the crimes of Possession with Intent to Distribute and Conspiracy to Distribute Heroin, Cocaine, and Methamphetamine.

As the indicated devices can contain removable storage mediums such flash memory or Subscriber Identity Modules, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data).